cases 2022-12-86. Ms. Maynard. Thank you, Your Honor, and may it please the Court. Deanne Maynard for Teradata. I'd like to reserve three minutes for rebuttal. In granting summary judgment on Teradata's antitrust and trade secrets claims, the District Court erred as a matter of law and decided disputed factual questions. I'd like to start with the antitrust claim. Ms. Maynard, this is Joe Serrano. Can we start with jurisdiction, which strikes me as a non-trivial issue here? Let me just tell you the things that I'm thinking about and concerned about, which maybe can be summarized with reference to the discussion in the report by the reply filing at the motion stage of Chamberlain. The argument I think by SAP is that what it said about its patent counterclaims was said in response to Teradata having asserted up to that stage, I think the number was 482 trade secrets. Anyway, a very, very large number. What it did not say was that its patent counterclaims were directly responsive to the single technical trade secret claim left in your case by the time you were responding to the compulsory counterclaim standard is not met and that under Chamberlain and the case relied on in Chamberlain, the dropping of all the technical trade secret assertions but for the one remaining one leaves the parties with respect to all the dropped claims in the same position as if they had never been made and therefore they don't count for purposes of the jurisdictional determination. Now, there's a lot packed into that, but that's what I'm worried about. Yes, your honor. I think just out of the gate, Chamberlain is distinguishable because there, the dropped claims were the very patent claims that were the hook for jurisdiction and once they were dismissed. Absolutely. One has to translate Chamberlain into the counterclaim context. Absolutely, but obviously, one can do that. On the facts here, your honor, the timing that they assert in their reply brief is mistaken. Teradata served several amended narrow trade secrets claims. By December 2020, we had narrowed the trade secret case to 19 trade secrets, more than half of which related to batch merge, which is, as you know, the trade secret here today. And in SAP's severance opposition, which they filed in March of 2021, they stated that what SAP said in 2019 holds true today. Quote, Teradata's trade secret claims are intertwined with SAP's counterclaims. That's an APPX8881. And then I would point your honor to a chart that SAP presented to the district court. It's not in the joint appendix here, but you can find it at ECF175-4 and we cite it in our opposition to the motion to transfer at page 12. Cite it, but show it, right. Dealing with this fundamental jurisdictional issue has been a challenge because almost nothing was actually supplied to the court. So if you do have a chance to review the SAP chart that they filed with the district court to convince the district court that their counterclaims were arising out of the same transaction or occurrence and should not be severed, that's ECF175-4. On page six of that chart, they deal with alleged trade secrets 24 to 30. And on page 12 of that chart, they deal with trade secret, I mean, sorry, page 15 of that chart, they deal with trade secret 31. Those are eight of the 10 trade secrets now asserted that relate to batch merge. The two that they don't discuss had not been asserted at that point. So I do think that all that SAP said about how their claims interrelate, the same technologies are at issue, the same witnesses are at issue, the same themes are at issue, apply equally to the case as narrowed. So and just to be clear, so my understanding is the district court in its severance order didn't actually rule on the same transaction. It said something like it appears today, yes, it appears from the argument presented to this juncture that SAP's counterclaims arise out of the same transaction or occurrence that didn't quite settle the issue. But this is also something because it's jurisdictional, we would have to decide for ourselves. What do you think is in fact the relation between any of the particular patent assertions and the trade secrets at issue here? I understand that they would clearly be enough if the patents either claimed or described from a filing time before the asserted trade secrets were turned over or were shared, I guess, that actually taught those things and then they wouldn't be trade secrets because they'd be in the public domain. I don't understand that to be the assertion, so I'm left unsure what it means as a concrete matter to say they were related. Well, I think the standard under this court's decision in Reardon is quite broad, as I'm sure your honor knows, and the question is whether there's a logical relationship between the counterclaims and the claims at issue. And here that's clearly the case. SAP alleges it invented what we claim as our trade secrets, and so they claim these patents show, and I point you to this chart that they created, which goes into much more detail with a chart about the patent claims and a chart about our trade secrets, that makes that tie. But at the level that matters for the broad standard that is the compulsory counterclaim, the federal rules encourage related claims to be brought together. It is a broad standard for compulsory counterclaims. If we were to win the trade secrets claim against them, they could not bring a separate suit and assert that these patent claims show that, in fact, they invented that trade secret first. That's their claim here, and they need to bring that in this action, as they have done. And you say that's their claim here, I think on the basis of some ECF 175 document that hasn't been supplied to us, right? Because I don't think anything else you cited says that. We cited on page 12 of our motion to transfer opposition, your honor. We briefed the jurisdictional question in our opening brief, and they did not respond. I took them to have somewhat abandoned this argument. Well, they did say see our motion papers in their jurisdictional section, and you didn't actually respond to their reply about Chamberlain and so on in the motion papers. Can you supply this crucial ECF 175 document to the court, please? Yes, of course, your honor. We will do so. Thank you. If I may turn to the merits of our antitrust claim, I would like to start there. The district court aired, so SAP is engaging in a classic illegal tie. Our evidence shows that they are forcing their locked-in ERP customer base to buy a product that they don't want, and charging them premium prices for a substandard product, and that that tie is causing the very harm of such arrangements. It's foreclosing competition from others like Teradata that offer competing products. It's foreclosing competition on the merits, and under any standard, per se, or rule of reason, Teradata has sufficient evidence to go to a trial, but the Supreme Court has made clear that it is the per se rule that applies here, and under the per se test, there's only one element in dispute, which is at summary judgment, which is SAP's market power, and SAP does not dispute that if Professor Asker's definition of the tying market comes in, then SAP, then Teradata has sufficient evidence to create a claim, and here that testimony should have come in. Professor Asker is a well-recognized economist who applied well-established methods, as the amicus briefs show, to determine that SAP has market power over a certain subset of customers, namely large enterprises who are a number of different elements of a tying claim, whether it's rule of reason or per se, that are in play here. Some of them, I think, discussed more fully than others in the district court. I want to put aside for the moment the question of whether the definition of the tying product market was proper, even the question of whether the definition of the tied product market was proper, and focus on the question of whether there was sufficient evidence even to go to a jury of effects in the tied product market of the only specific thing tied, which was the itself not an EDW product. This is, I guess, summarized or illustrated is probably the right term in the figure shown on page 48 of the red brief that picks apart the several different elements of the analysis, the different kinds of licenses to HANA, the different kinds of things that HANA does and that complements of HANA, like the BW product would do, and illustrates the contention that there's no reasonable connection between the limited tied product and effects on the tied product market. So there's a lot to unpack there, your honor, so if you could just bear with me while I try to march through it. So first, the harm to competition, if the per se rule applies, the harm to competition that's required to be shown is only de minimis. The Ninth Circuit has said $100,000. They've never disputed that in the per se context. So the only element at issue for summary judgment was SAP's market in do believe the per se rule applies, but I'll take your question as assuming that perhaps the rule of reason applies and therefore we have to show substantial harm to competition, and I believe we did so. The chart on page 48, there's multiple problems with that chart, but in most it shows a triable dispute of fact on substantial harm to competition. So first, just to note, that chart's not drawn to any sort of scale. It also talks about the percentage of customers and it claims that only 12% of customers use the full use license. Our expert put that at 20%, so there's a dispute of fact on that point, but there's a dispute of fact about whether or not the, so, and also, I would take issue, your honor, the HANA is tied. All of HANA's analytical capabilities are the yes, they give an option, but you have to buy HANA and you have to buy it in one of its forms, and the first time they've even suggested that the full use is not part of the tie was in this port, that argument is forfeited, but in any event, I think you're, you believe the runtime license is tied, correct? Well, as I understood it, the only thing that anybody is actually, and I didn't understand this to be in dispute, that any, the only thing that SAP enterprise resource planning customers need to buy contractually or is a runtime license, that is, it's completely optional whether any such customers pay the extra for the full use license that would then enable the use of the HANA data with other products, basically. Well, the first time they ever suggested that, your honor, was in this port, and they're not even clearly making it here, it's just in the parentheticals that go with the chart. Was it ever in dispute that ERP customers did not have to buy a full-time, full-use license? They have to buy one or the other, and they're given an option, but as our expert's testimony shows, the harm to competition flows from the tie of HANA, which requires them to buy one or the other, because it's the purchase of HANA's analytics that distorts the competition and causes foreclosure in the marketplace, and he estimated that of the sales of HANA, and he did a differences and differences regression that proved that the sales of HANA that were tied to the S4 HANA were causing harm to Teradata, and he also estimated that for, there was close to half, half to three quarters of foreclosure in the markets, in the EDW market as a result of the forced purchase of HANA, a product that had very, very poor uptake in SAP's own experts' words before the tie, and now the vast majority of SAP's revenues from HANA come from the tied sales. Ms. Maynard, your time is up. We'll give you your rebuttal time back. Judge Toronto, did you wish to ask any further questions at this time? Okay, can I just ask, I guess I'd like Ms. Maynard to have a short opportunity to highlight her best point of her trade secret appeal. Thank you, Your Honor. I appreciate that. The district court erred in concluding that we had not marked, and also that somehow these agreements had given SAP the keys to one of our most important trade secrets, which is batch merge, which is something that we developed and have been using for years in conjunction with Teradata's flagship database product, which is essential to its massively parallel processing. There's nothing in the MNDA which requires all the details of the trade secret to be marked in order to protect it. The point is to put it on notice, and we had at least a dispute of fact as to whether we had provided sufficient notice that it was marked, because the design document where we first disclosed key aspects of batch merge was marked. And then secondly, batch merge is partner materials, which the SDCA clearly reserves to Teradata, and 9.2 of the SDCA gave them only a limited license to use it, and only during the bridge project. At a minimum, there is a dispute of fact on that. We have an email from an engineer who recognizes it was SAP engineer and not allowed to share it. If you have any questions, otherwise, I would like to have the time. Thank you, Ruth Maynard. We will restore your time. Let's hear from the government. Mr. Kuhlman. May it please the court. Patrick Kuhlman on behalf of the United States. We're here today to address the correct legal principles for defining relevant markets in antitrust cases. The district court departed from the flexible inquiry into market realities that should guide market definition, because the types and the quality of the available evidence vary from case to case. Courts define... Can I just double check? You're not asserting a position about per se versus rule of reason as the applicable standard for assessing the tie that's at issue here. Is that right? That is correct, Judge Chirondo. We're just errors in the district court's market definition analysis. Okay. Thanks. I want to focus on two errors this morning where the district court improperly limited the use of important market definition tools. The district court's treatment of Brown-Schuh's practical indicia and the district court's treatment of aggregate diversion ratio analysis or ADR analysis. First, the district court wrongly confined the practical indicia to sub-market cases. There's no rigid dichotomy between sub-markets and primary markets. A sub-market is simply a smaller relevant market that resides within a broader market. Same market definition tools apply regardless of how the candidate market is denominated. The district court was also wrong to require three or more practical indicia to define a relevant market. Ninth Circuit's explained that the indicia are practical aids and shouldn't be used in a talismanic fashion. They're to be used pragmatically. Indeed, in ITT, the Ninth Circuit affirmed the definition of one of the relevant markets, market for telephone equipment, using less than three indicia. So second, the district court wrongly questioned the validity of aggregate diversion ratio analysis or ADR analysis. This methodology is used by courts, endorsed in antitrust treatises, and in the... Can I just double check? I don't remember seeing any citation to a court of appeals decision using aggregate diversion ratio. I'm vaguely recalling two district court opinions. Is that what we're talking about here? That is correct. That is correct. Okay. Yes. There's two. There's actually, I believe, there's Wilhelmsen, Cisco, Aetna, H&R Block, Bizarre Voice, and Dial Corporation cases. The district court statement that ADR analysis has been rarely accepted by courts was wrong. It is accurate, as your Honor points out, that there aren't that many cases addressing ADR analysis, but in those cases, it uniformly accepts the general validity of the methodology. It's a standard methodology in the words of the H&R Block court. I'd also like to turn to... The district court was also wrong in thinking that actual pricing data was required to implement an ADR analysis. That type of data often is not available, and it's not imperative. Aggregate diversion ratio requires an estimation of where customers... Can I just ask, would it be a reasonable decision on a district court's part, either exercising tabard authority, or game all, or summary judgment, to say that pricing data was either available or could have been, but wasn't used, and when it's available and not used, that's a reason to reject a conclusion based on a subset of the relevant but available data? I don't take your position to reject that. No, no, no. We're not saying that the district court, in exercising its discretion, couldn't consider all of the available evidence and determine the weight of that evidence. Our position is rather that the district court endorsed a categorical hard and fast rule that actual pricing data needs to be used, and that actual pricing data is one way to estimate diversion, but it's not the only way. Other types of data and evidence can do so. So for example, let's say General Motors sales people are hearing all their customers saying, we're considering GM trucks and we're considering Ford trucks. So that suggests that for GM customers, Ford trucks are their next choice, and that's strong evidence of where GM customers would go if Ford increased the price of its trucks. Indeed, in Cisco, Wilhelmsen, and H&R Block, courts define markets using ADR analyses that did not include actual pricing data. If the court doesn't have any further questions, we ask that the court correct the errors in the district court's market analysis, and we thank the court for the opportunity to present our views. Thank you, Mr. Coleman. Mr. Shanmugam. Thank you, Judge Lurie. Ken and Shanmugam of Paul Weiss for the SAP athletes. I'd like briefly to start with the issue of jurisdiction, which Judge Toronto raised, and then I will go to the merits of the district court's summary judgment decision. On the issue of jurisdiction, while we recognize that it is a close question, we believe that the better view is that the Ninth Circuit has jurisdiction here. Now, I understood my friend, Ms. Maynard, to be quibbling with the timing of when Teradata narrowed its trade secret claims, but I didn't understand her to dispute the proposition that by the time of the district court's ruling on the issue of summary judgment, those claims really had been narrowed to what is before the court now, at least with regard to the technical trade secret claim, and that is the claimed trade secrets concerning the batch merge method. That narrowing in our view is critical for the simple reason that the patents that were the subject of our counterclaims were various patents that concerned the HANA database itself and not the subject of the trade secrets claim, which is the method for communication with that database. And so whatever the timing, our fundamental submission is that this is effectively a constructive amendment of the complaint. Essentially, what has taken place here is that Teradata has abandoned the literally hundreds of trade secrets that it initially asserted, which is what precipitated the filing of the patent counterclaims. Just to be clear, Mr. Chanigan, if I remember right, the Chamberlain analysis deems a constructive amendment to be one in which the parties are left in the position that they would have been in had the matter never been litigated. Okay. So I just want to make sure. SAP agrees that all of the trade secret matters asserted, but later abandoned, remain available to Teradata to assert. Because if not, then it falls into the actual Chamberlain holding that there was essentially an amendment like a dismissal with prejudice, in which case the rationale for disregarding the initially filed but dropped claims would no longer apply. I think what I would say about that, Judge Toronto, is that it does appear that Teradata has abandoned those remaining trade secret claims. And again, in some sense, we're sort of piecing this together from, for instance, their opposition to the summary judgment motion. But it does appear at this point as if the only trade secrets they are asserting with regard to the technical claim are the batch merge method claims. And I would note that to the extent that the parties took... And what does your ECF 175 document, which I'm afraid since I haven't seen, I'm just remembering what was asserted about it. To me, the heart of Ms. Maynard's point on this is that you actually did make assertions about the close relationship between these asserted patents and the still live technical trade secret assertions regarding batch merge method. So I don't have that document in front of me, in part because it was obviously not a focus of the opposition to the motion to transfer. But I think that what I would say is that to the extent that we made assertions below, more generally, first, that there is no estoppel, obviously, in the context of jurisdiction, and I would rest on our submissions for that proposition. But beyond that, even if there were any sort of estoppel, the district court did not issue a definitive ruling on the issue of severance. And I would point you to the document that I think you were referring to earlier, docket 418, where the district court essentially said, I'm not going to sever at this time. That issue remained a live issue below. And on the substance of what this court has to decide, the application of the Reardon standard, again, our fundamental submission here is, again, whatever was said below, that if all that is left here is the claim for the method of communicating with the database, that was quite simply not the subject of the asserted patent counterclaims. Those were, again, claims variously to the database itself. Now, I do want to, and of docket 175, and we're happy to respond to that. I do want to turn to the merits, given the limited amount of time. And if this court concludes that it has jurisdiction, our fundamental submission is, obviously, that summary judgment was correct, both with regard to the antitrust and the trade secret claims. Now, at the outset, just to provide a roadmap to the court, I think there are two ways in which the court could affirm the ruling on the antitrust claim. The court could hold that district court correctly exercised its discretion in excluding Dr. John Asker's qualitative and quantitative analysis, supporting his market definition for the time product. Or it could conclude in the alternative, and the district court made clear that this was an alternative basis for its summary judgment ruling, that Teradata simply failed to bear its burden of coming forward with evidence of anti-competitive effects in the EDW market. And under the rule of reason, which in our view applies, Teradata would obviously have to meet that element in order to move forward on its antitrust claim. Why does the rule of reason apply? So in our view, the reason that the rule of reason applies is that it is clear now, and the Supreme Court has indicated as much in Illinois Tool Works, a case with which I know that this court is familiar, that not all time claims are subject to the per se rule. Instead, the question is whether you are in a context where there are plausible pro-competitive justifications, such that judicial experience provides a basis for believing that there might be a pro-competitive justification, and therefore that the rule of reason applies. And we rely, as the court is aware, on the D.C. Circuit's decision in Microsoft, but perhaps more relevantly, the Ninth Circuit's more recent decision in Epic Games. Now to be sure, in both of those cases, the courts made clear that their holding was limited to the specific context in front of it, I think with appropriate judicial modesty. But when you look at the reasoning of those decisions, they make clear that in a technology market like this one, where the time product and the tied product are technologically integrated, and where, as is true here, that the integration provides benefits in the form of improved efficiency, that application of the rule of reason is appropriate. And I would note that for purposes of this question, the question of which standard applies, I think the question is really just whether there are plausible pro-competitive benefits. Obviously, the question of whether those pro-competitive benefits justify the allegedly anti-competitive practice is a question for the merits. And really, at bottom, we think that there is simply no valid reason for limiting the application of the rule of reason to cases where, as was true in Microsoft and Epic Games, the tying product is the platform, or where the benefits inure to third parties. The court will be aware of the reasoning of the Ninth Circuit in the recent Epic Games decision, where the court warned against per se treatment in software markets like this precisely because those products are highly innovative, they involve short product lifetimes, with a constant process, as the Ninth Circuit put it, of bundling, unbundling, and re-bundling of various functions. Now, if the court... And just to be clear, when you say integrated, you don't either mean or need to say that the integration is what I would call absolute. That is, the idea that HANA cannot be made to work with any other ERP and... Yes. Judge Tronta, that is correct. And obviously, the best evidence of that, in some senses, that SAP did sell HANA separately with modest success in the marketplace. My point is... Right. Somebody, at least I think in the record, did get it to work with something else, right? Yeah. Well, I'll come to that when we get to the issue of anti-competitive effects. I think my point, for purposes of the application of the rule of reason, is simply that we did present unrebutted evidence that the integration of S4 HANA with HANA came with benefits in the form of improved performance. And that that, in our view, is what triggers the application of the rule of reason, the fact that there was that plausible pro-competitive justification. And there may be contexts in which integration would not have that benefit, but here, again, there was evidence to that effect. And that brings us... On that assumption, can you now talk about why some total of Teradata's evidence from Dr. Asker and others isn't enough to create a triable issue on anti-competitive effects? Sure. I'd be glad to. And then, with the court's leave, I'll spend literally a minute on the trade claims and on the government's submission. On the issue of anti-competitive effects, as a threshold matter, Teradata failed to identify a single customer that used HANA when purchased together with S4 HANA, the allegedly...the product in the tying market, as an EDW product, much less to replace Teradata's EDW product or the EDW product of any competitor. And to the extent that Teradata relies on non-tied sales of HANA, we would submit that that is irrelevant to the analysis, that the fundamental question here is, with regard to the alleged tie, whether that tie foreclosed market competition. Now, as you pointed out, Judge Toronto, the vast majority of S4 users were subject to these runtime licenses, which My friend, Ms. Maynard, says, well, maybe there were 20% of customers who had full-use licenses. We believe the correct number is 12%. But either way, the vast majority, again, were subject to these restrictions. Now, Teradata argues that those customers might nevertheless have been able to use HANA as an EDW product by virtue of another product, BDW4 HANA, which SAP also made available. But again, there was no evidence that that actually took place. And with regard to Dr. Asker, whose testimony on this issue was rightly excluded, Dr. Asker simply assumed that every customer who uses S4 HANA with HANA would use HANA as an EDW product and would cease using Teradata's and other customers' EDW products as a result. And that is how Teradata argues that there would be market foreclosure of 30% or more across competitors in the tied market. What Asker basically did was just bluntly say, look, it appears that somewhere in the neighborhood of 48% to 73% of Teradata's customers use these SAP products, and we assume that if they purchase the tied product that they would all switch. That simply is an unsupported assumption here. And to the extent that Asker conducted a regression analysis that showed some decline in customers' spending on Teradata products, that obviously says nothing about the relevant causal question, which is whether customers were substituting HANA for Teradata's EDW products. So again, our fundamental submission on the antitrust claim is that that's one route for this court to say that the summary judgment on the antitrust claim was appropriate. If you look at footnote 16 of the district court's opinion, it made clear that it would have ruled on that ground. Of course, the alternative ground is to uphold, under the abuse of discretion standard, the exclusion of Asker's market definition. And maybe I'll turn to the government's submission on that, since it was really the government that made some suggestion that the district court committed legal error in that regard. Can I just ask, is there any... I took the government to be making a series of there shall be no absolute rule, and then, you know, one, two, three, four, maybe five. Do you disagree with the submission that there shall be no absolute rule? You know, we don't. We don't, actually. I think I was in vigorous agreement with about 99% of what Mr. Kuhlman said. And so, you know, with regard to, for instance, the brown shoe factors, Teradata really didn't try to make a brown shoe argument below until the oral argument on summary judgment. But really, even there, as the district court noted in footnote four of its opinion, it only really relied on one of the brown shoe factors, and that is industry or public recognition of the market. And we don't think that merely relying on one indicium would be sufficient, but we really read the district court simply to be saying that the very case you cite, Teradata, requires three or more such indicia. And that arose in the context of a sub-market, but we obviously would acknowledge that you can use the brown shoe factors when defining the market as well. The other thing that Mr. Kuhlman focused on was the issue of ADR analysis. And Judge Pronto, I think you rightly exposed the fact that ADR analysis has not been invoked very often by courts. We're not aware of a case that has actually invoked it in the context of tying claims as opposed to in the context of a merger. And certainly, Teradata cites no case in which a court has accepted ADR analysis under even remotely similar circumstances. But we don't read the district court to say you have to have actual pricing data. We simply read the district court as saying that the consumer resource management data, the CRM data on which you relied, data that Asper himself recognized may not be a reliable indicator, is insufficient. Because that was simply a database indicating who the competitors were for SAP and others. It indicated nothing about whether customers would switch in response to a price increase. And the district court decisions cited by Teradata and the government were cases where there was more robust data, even if that doesn't rise to the level of actual pricing data. Counsel, your red light is on. We'll give you five minutes more to even up with Teradata. Great. Thank you, Your Honor. And so I think, again, that we agree largely with the district courts, with the government's submission on those legal principles. The government takes no position on the bottom line here concerning the exclusion of Asper's testimony. I think because some of the relevant underlying material was under seal. But I think even with regard to the unsealed material here, the district court's exclusion was pretty clearly proper. And I'll say just a word about that. And of course, Ms. Maynard can respond to this on her rebuttal because she didn't get as of Asper's testimony. The exclusion of his qualitative analysis was appropriate because there he defined the market in terms of large enterprises, which in turn he defined in terms of the number of employees and users at those companies. And Asper simply failed to offer a methodology justifying that aspect of his market definition. He relied on two pieces of evidence that didn't even really support that definition. And he failed to come to terms with the conflicting evidence and conflicting industry practice. That is an appropriate application of Daubert, and notwithstanding Teradata's efforts to suggest that this very experienced district court judge, Judge Oreck, was somehow weighing the evidence. I think fairly understood the discussion, particularly at page appendix 28, was a garden variety application of Daubert. Now, Teradata spends a lot of time in its brief on the quantitative aspect of the analysis. And frankly, it's not even clear to what extent Asper was really relying on that. If you take a look at page 14121 of the appendix, he said that none of his opinions relied on the precise aggregate diversion percentages implied by the CRM data. But again, to the extent that he did, our fundamental submission is that the district court's decision can be sustained on the ground that whatever the propriety of ADR analysis more generally, and I think the district court rightly recognized that this is rarely used, and again, it's used predominantly in the merger context, that Asper did not base that analysis on reliable transactional data, the sort of data that you would need in order to make confident predictions about whether or not customers would in fact switch, such that you could assess whether or not diversion is occurring, and if so, whether the amount of diversion would make allegedly anti-competitive practices rational. And so again, this seems like a fairly conventional application of Daubert to the ruling that ADR analysis is improper. Finally, with regard to the trade secrets claims, I think our fundamental submission with regard to the trade secrets claims is simply that the district court's decision was appropriate, and appropriate really on both of its grounds. First, on the factual ground, the TERRA data did not sufficiently mark its claim trade secret as confidential. The design document on which TERRA data relies merely used the phrase batch merge. It did not disclose the actual trade secret, and the author of that document himself, John Grass, testified that he did not believe, quote, that he ever said that he conveyed the batch merge method in this document. Instead, he testified that he verbally conveyed the method during design calls. That is insufficient. That is pages 21970 and 21978 of the appendix. But even if you didn't accept that and somehow thought that there was a factual issue in dispute here, the relevant agreements here gave SAP the power to use this method, because they drew a demarcation between, on the one hand, TERRA data's own programs, software, or other material, which was provided under a project plan, that's section 9.2 of the proposed modifications to SAP's own software clearly fall under the latter category, as Judge Oreck correctly determined in his opinion, and that was a construction of unambiguous terms of the contract as a matter of law, and therefore... Can I just double check something just to make sure I understand? The claim of trade secret misappropriation here is a claim of improper use, not of any disclosure by SAP, or is that not an applicable distinction here? I believe that that is correct. In other words, the claim here is that by incorporating this trade secret into SAP's software, that SAP was That having been said, Judge Toronto, and this will be my final point because I see that my red light is truly on, everybody knew that SAP was going to make these changes to its software available to others. I would point you to the evidence we cited on pages 75 and 76 of our brief, and indeed, TERRA data went so far as to suggest that TERRA data's own employees emphasized that fact in order to induce SAP to make the change to its own software, and in light of that evidence in particular, it seems a bit odd that TERRA data would dispute the proposition that this falls within the suggestions of changes to SAP's own software side of the line, and so we would respectfully submit that if this court does exercise jurisdiction, it should affirm the district court's judgment, and otherwise, it should transfer the case to the Ninth Circuit. Thank you. Counsel, Ms. Maynard, you have four minutes for rebuttal. Are you ready, Your Honor? We're hearing you. We hear you. Thank you, Your Honor. So, I appreciate the indulgence and the extra time. So, on the per se versus rule of reason, it's certainly not the holding of Illinois Tool that the per se rule does not apply. If anything, Illinois Tool reaffirmed that Jefferson Parish is the rule for coercive ties where, like here, a party like SAP has market power in the tying market. Epic and Microsoft are fundamentally different cases that drew a very narrow exception for when the tying product is a software platform, and the reason they did so, the reason they drew an exception from Supreme Court precedent, which is, of course, unusual, is because they saw benefits to third-party app developers who were using those platforms. So, it was a new form of competition. There's nothing like that here. All SAP does here is say the same things that every tying defendant says. We sell these because the products work better together. If that's true, then people will buy the separate product regardless of whether it's tied. Even if you were to look at the pro-competitive benefits here, the Hoist Declaration doesn't have any cognizable pro-competitive benefits. They're just throwing up their hands and saying we can't license. There's a dispute of fact about that. Couldn't grant summary judgment under the rule of reason without resolving that dispute of fact. The On foreclosure, Judge Taranto, even if you think that the HANA with the runtime license is the only tied product, we have substantial evidence to create a dispute of fact on that. First, there is a dispute of fact about whether or not that can be used to compete with other EDWs. We lay out the evidence in our reply brief on 16 to 17, but there are SAP documents that explain exactly how to do that. The only thing that the runtime license prevents is exporting or importing data into HANA. It doesn't prevent using HANA's analytics to analyze enterprise-wide data. And I point you all the sites that we have on pages 16 to 17 of our reply, which shows HANA can be allowed data loading from non-SAP solutions via the application layer. That's the BW product to which Mr. Shammigan referred. It is an inferior product, but you can use it. And the question is not whether any single has switched over or is even using HANA as an EDW. The question is whether it's foreclosing competition on the merits in the EDW market. So is it distorting consumers' choices? And Professor Asker's evidence shows that it is. Even if you take only their chart on page 48, by their own assertion, the vast majority of people are taking EDWs with a runtime license, which Judge Taranto, and I'm just assuming with you, that that is the only tied product. Professor Asker did a differences-in-differences regression analysis that, despite what Mr. Shammigan says, did show the causal effect for Teradata's lower sales as a result of the tie. So sales on HANA. That's why you do a differences-in-differences regression to separate out sales that weren't affected. And we have a dispute effect on that. Even if you only look at the runtime license, it's still, as they say, the vast majority of customers. There's no reason to exclude the tying market here either. Professor Asker used a well-established qualitative methodology and carefully explained all of his opinions. Can I ask one question? Yes. Ms. Boehner, I just have one question on the trade secrets. If Teradata, and correct me if I'm wrong on the facts, but if Teradata offered batch merge as some kind of solution to HANA or SAP's own products, why isn't that, as a matter of law, an input rather than partner information that's controlled and remains with Teradata and can only be used for the bridge project? Or why is there a triable issue on that? Because the way that the agreement is structured, Judge Hughes, is that Teradata came into the project under Section 10. It retains all of the IP it brought to the table. Batch merge is part of that IP. It's something they've been using for years with their Teradata-based product. Then the question is, did SAP get any kind of license to it and what? Under 9.2, partner materials, which includes tools, Teradata tools, are licensed only during the bridge project for a limited time. That's the license that governs here. Their reading of input, which would essentially be in this project where everybody's working back and forth together all of the time during the course of the project, would subsume that reservation of rights because anything Teradata said to them to try to help the project work would then forbid input. As a matter of law, the agreement shouldn't be read that way. At a minimum, there's a dispute of fact whether this is a tool that would fall within partner materials. Thank you, counsel. The case is submitted. We appreciate both arguments.